# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE

Assigned on Briefs October 26, 2011

## STATE OF TENNESSEE v. DEERIC MCAFEE

**Direct Appeal from the Criminal Court for Knox County**
**No. 88538     Mary Beth Leibowitz, Judge**

_____

**No. E2010-01730-CCA-R3-CD - Filed March 4, 2013**

_____

A Knox County Criminal Court Jury convicted the appellant, Deeric McAfee, of second degree murder and reckless endangerment. The trial court sentenced the appellant to a total effective sentence of twenty years in the Tennessee Department of Correction. On appeal, the appellant argues that the evidence was insufficient to support his conviction for second degree murder, the trial court erred in excluding evidence of the victim's criminal history, the trial court erred in allowing the State to introduce on cross-examination a letter written by the appellant, the trial court erred by giving an instruction regarding flight, and the trial court erred in sentencing the appellant. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., J., joined. JERRY L. SMITH, J., not participating.

Bruce E. Poston, Knoxville, Tennessee, for the appellant, Deeric McAfee.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; Randall Nichols, District Attorney General; and Leslie Nassios, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## I. Factual Background

On February 19, 2008, the Knox County Grand Jury indicted the appellant for the

premeditated first degree murder of Tray Sherman and for the reckless endangerment of Timothy Flack, Jr. At trial, Roberta Flack testified that in 2007, she worked as a secretary and was addicted to cocaine. In October 2007, Flack lived in a residence at 1511 Connecticut Avenue with her three minor children, the youngest of whom, Timothy Flack, Jr., was four years old. Her cousin, Anna Street, also lived with her. Flack stated that twenty-three-year-old Sherman was her boyfriend and that he occasionally stayed with her. However, she noted that their relationship was not exclusive. Flack acknowledged that she kept drugs in the house, that she used drugs with Sherman, and that Sherman sold drugs. Flack said that the appellant had previously been to her house with her cousin, Precious Pruitt, and that he lived with his grandmother and other family members on the next street.

Flack said that on October 8, 2007, Sherman and his friend, Robert Davis, came to her house around 6:30 p.m. or 7:00 p.m. Sherman was driving his green Suburban, and he parked in the driveway. When he arrived, Moneek Logan was on the porch with Timothy[1] and Logan's niece. Street, Diez Debro, and Flack were in the kitchen. Sherman came into the kitchen, upset and scared, and told Flack that he had a confrontation at a store down the street with Treece Hamilton, who was the appellant's cousin. He said that Hamilton was injured during the confrontation. Flack said that Hamilton had been her friend and that Hamilton and Sherman had previously argued because of jealousy.

Later, Flack and Sherman left the house, intending to go to the store for cigarettes and to take Davis home. As they stepped outside, Flack saw the appellant sitting on the porch with his head down. She asked what was wrong, the appellant replied that nothing was wrong, and he got up as if to leave. Flack and Davis walked toward Sherman's truck. The appellant and Sherman stood at the edge of the driveway near the sidewalk and started talking. They did not argue and smoked marijuana together. Flack and Davis repeatedly told Sherman that they needed to leave. Eventually, when Sherman ended the conversation and turned to walk toward his truck, Flack saw a flash from a gun. Sherman began to run, and Flack heard a couple more gunshots. Flack said that Davis ran away, but she did not know in which direction. The appellant ran toward the park across the street from Flack's house, in the direction of the appellant's grandmother's house.

Flack told Logan, who was still on the porch with the children, to take the children inside the house. Logan complied. Flack looked for Sherman and found him lying in an alley around the corner from the house. Flack tried to talk to Sherman. Street came to the alley and started performing CPR on Sherman. Flack heard blood rattling in Sherman's lungs and told Street to stop. Flack called 911. Before police arrived, Flack removed $20

---

[1]Some of the individuals in this case share a surname. Therefore, for clarity, we have chosen to utilize the first name of this person. No disrespect is intended.

in cash and cocaine from Sherman's pocket. She gave the items to Street and told her to get rid of them. Flack said that either the police or paramedics removed Sherman's white t-shirt while trying to resuscitate him. Flack stated that Sherman did not have a gun that night.

Flack said that, after midnight, she spoke to Investigator Still. She identified the appellant as the shooter, but did not disclose that she had taken drugs from Sherman's pocket. She stated that she later saw bullet holes in her house and that the holes were not there prior to the incident.

Flack said that after the shooting, she received calls and "dirty looks" from the appellant's friends and family and that she feared for her family. Accordingly, she moved away from Knoxville.

On cross-examination, Flack acknowledged that she was on probation for a "bad check" charge in Ohio. She said that she gave the cocaine she took from Sherman to Street and that Street hid it between her breasts. Flack acknowledged that Sherman occasionally carried a gun but maintained that he was not carrying a gun on the night of the shooting.

Flack stated that Sherman was about 6 feet tall and weighed approximately 240 pounds. She said that Hamilton was approximately 5 feet tall and weighed more than 150 pounds. Flack stated that Hamilton was known to carry a knife and guns. When Sherman arrived at Flack's house, he told her that he hit Hamilton after she threatened him and reached into her purse. Flack said that when she and Sherman came outside the house, the appellant called Sherman over to him to talk. Flack stated that she thought the men were "talkin[g] about the confrontation, but it was no upset." She said that the appellant was wearing a long t-shirt, and Flack thought that the appellant took the gun from his pants pocket or from his belt. She saw the gun in the appellant's hand after the shooting. Flack said that although the appellant had been at her house many times, he had never caused trouble until that night.

Moneek Logan testified that she and Flack were friends and that on the night of October 8, 2007, she was at Flack's house. Logan said that sometime after 6:30 p.m., she was sitting on the porch, and Sherman and Flack were inside the house. Later, they came outside, and Flack walked toward Sherman's truck. Logan went into the house, got a beer, and went back outside. She saw Sherman and the appellant and Sherman calmly talking. When Logan turned around, she heard shots fired. She saw the appellant run toward the porch and Sherman run toward the back of the house. She said that she never saw a gun.

On cross-examination, Logan stated that after the shooting, she left the house and went to the alley where Sherman was lying. She saw Flack try to revive him, but he was

-3-

already dead. She said that she did not see Flack go through Sherman's pockets.

Knoxville Police Investigator Steve Still testified that he arrived at the scene at approximately 9:03 p.m. on October 8, 2007. He spoke with people on the scene and learned that the appellant was the shooter. After about an hour, Investigator Still went to the hospital and saw Sherman's body. Investigator Still saw a gunshot wound to the back of Sherman's left torso.

Investigator Still said that based upon his investigation, he concluded that the shooter was standing near the sidewalk and fired toward the direction of the house. Flack specifically told Investigator Still that Sherman did not have a gun, and no other witness reported Sherman having a gun.

Investigator Still said that when he looked at Sherman's shirt, he saw a bullet hole surrounded by gunpowder burns, which indicated the shot was fired at close range.

On cross-examination, Investigator Still said that he had seen a police report documenting the incident between Sherman and Hamilton. He said that Hamilton had an injury to her face or nose. He stated that he did not know if the appellant, who was related to Hamilton, knew of the altercation before going to Flack's house.

Knoxville Police Crime Scene Officer Gerald Smith testified that at 9:20 p.m. on October 8, 2007, he reported to the scene of a shooting at 1511 Connecticut Avenue. Upon arrival, he learned that paramedics had already taken Sherman to the hospital. Officer Smith was informed that Sherman was discovered lying in an alley behind the residence. Officer Smith went to the alley and found a size XXXL white t-shirt that had a bullet hole in it and was stained with blood. Gunpowder was surrounding the bullet hole in the t-shirt, which indicated that the gun had been fired at close range. Officer Smith said that police never recovered a weapon in connection with the case.

Officer Smith testified that bullets had struck the front of the house. Specifically, a bullet hole was located between a window and the right side of the house and another was found in a down spout at the corner of the house. The location of the bullet holes indicated that the shots were fired toward the front of the house. Officer Smith stated that he did not find any cartridge casings at the scene, which suggested that the weapon involved was likely a revolver.

Officer Smith said that after examining the crime scene, he went to the University of Tennessee Medical Center emergency room trauma bay where he learned that Sherman had been pronounced dead. In the emergency room, Officer Smith took photographs of the bullet

entrance wound, which was located on Sherman's left side near the back. Officer Smith accompanied Sherman's body to the Forensic Center where the Knox County Medical Examiner performed autopsies. After the autopsy, Officer Smith recovered the bullet that struck Sherman.

On cross-examination, Officer Smith stated that during his investigation, he found nothing to indicate that Sherman had a gun. Therefore, no gunshot residue test was performed on Sherman. He stated that the bullet recovered during the autopsy was a medium caliber, such as .32, .380, or 9 millimeter.

Knoxville Police Officer Edward Todd testified that at approximately 6:00 p.m. on October 10, he and Investigator Still met at the scene to perform a follow-up investigation. He stated that they were unable to find the bullets that were shot into the front of the house.

On October 9, 2007, Dr. Darinka Mileusnic-Polchan, the Chief Medical Examiner for Knox and Anderson Counties, performed an autopsy on Sherman. She determined that the manner of Sherman's death was homicide and that the cause of Sherman's death was a single gunshot wound to the chest area. Dr. Mileusnic-Polchan testified that the bullet entered the left side of the chest between the ninth and tenth ribs, perforated the left lung, damaged the diaphragm, tore the aorta and the esophagus, and damaged the liver and the right lung. The bullet caused extensive internal bleeding. Dr. Mileusnic-Polchan found a small caliber bullet in the accumulated blood in the chest cavity. She found gunshot residue indicating that the bullet was fired from "extremely close range." She stated that the only thing she could definitively say about the position of the shooter was that the muzzle of the gun was pointing toward Sherman's left side or back and slightly upward. Dr. Mileusnic-Polchan said that the victim would have been able to move for a short time after the wound was inflicted. Sherman's blood tested positive for cocaine.

On cross-examination, Dr. Mileusnic-Polchan said that Sherman was 5 feet, 9 inches tall and weighed 225 pounds. The bullet traveled "slightly back to front, left to right, and slightly upward."

The State rested its case-in-chief.

Anna Street testified on behalf of the appellant. Street confirmed that in 2007, she was living with Flack on Connecticut Avenue. She stated that Flack was a liar, a thief, and a junkie.

Street stated that on October 8, 2007, Flack, Sherman, and Davis were in Flack's kitchen, snorting cocaine and talking about an incident that happened earlier. Afterward,

they went outside.  The children were in the kitchen, and Street went to the front bedroom, which faced the front porch.  Street said she looked out the window and saw the appellant walking down Connecticut Avenue toward Flack's house.  Street could not see what transpired outside, but she heard three gunshots that sounded like they were being fired from two different guns.  Street looked out the back window and saw Sherman running down the driveway beside the house.  Sherman was holding himself, had a gun in his hand, and fell in the alley behind the house.  She saw Flack approach Sherman, grab the gun, and take drugs from his pocket.  Flack "got rid of" the gun then began yelling for help.  Street went outside, and Flack asked her to help.  Street began performing CPR.  Street said that Flack asked her to hide the drugs and that she told Flack she did not want them.  Street admitted that she did not tell the police about seeing Flack remove the gun from Sherman's hand.

On cross-examination, Street said that she ran errands during the day of October 8, 2007, and that she got to Flack's house around 6:00 or 6:30 p.m.  She stated that Logan could have taken Timothy outside at some point, acknowledging that she was not watching Timothy's every move.  Street said that she did not know where Flack hid Sherman's gun.  Street stated that she told Investigator Still that Sherman had hit Hamilton hard and that Hamilton had to go to the hospital.  Street said that during her statement, she lied to police about Timothy being outside at the time of the shooting and about seeing no one with a gun, maintaining that she lied because she did not want to be involved and because Flack had threatened her.

Nicole ("Treece") Hamilton testified that the appellant was her younger cousin and that he was eighteen years old at the time of the incident.  She said that on October 8, 2007, she was standing outside Burnside Market with a friend when Sherman drove up, jumped out of the car, and hit her left eye.  She said the eye came out of the socket.  There was no bleeding, but the tear pocket burst and "ran water."  Thereafter, she was taken to Fort Sanders Hospital, then she was transferred to the University of Tennessee Medical Center.  She stated that she did not remember anything after she left Fort Sanders until she woke in the hospital a day or two later.  She said that she remained in the hospital for almost two weeks.  She stated that she was legally blind in her left eye and was going blind in her right eye.  Hamilton denied ever threatening Sherman, noting that he was a large man.

Robert Dwight Wade testified that in October 2007, he lived about a block away from the appellant.  At around 7:00 or 8:00 p.m. on October 8, 2007, the appellant called Wade and asked him to go to the basketball court.  Wade told the appellant that he could not go because he was "on punishment."  He told the appellant that they could play basketball at Wade's house, but the appellant never came to Wade's house that night.

Robert Davis testified that he was with Sherman on October 8, 2007.  He stated that

he saw Sherman hit Hamilton in front of the Burnside Market. Davis said that Sherman always carried a gun and that he had a black .38 revolver with him that day, wearing it against his hip and concealing it with his shirt. Following the altercation, Davis and Sherman went to Flack's house. Upon arriving, they went inside and snorted cocaine. After a while, Sherman agreed to take Davis home, and they went outside. Davis did not notice the appellant approach the house, but he later saw him speaking with Sherman at the curb. Their conversation was not loud. Next, Davis heard gunshots and saw the appellant running away. Davis could not recall the direction in which the appellant ran. After the shots, Sherman ran behind the house into the alley, still carrying his gun.

Davis testified that Flack told him to not let the appellant "'get away with this,'" saying that he needed to tell the police that Sherman did not have a gun. Davis said that he complied and lied when he gave his statement. He changed his story one or two weeks before trial when he told the State that he had lied in his statement. Davis admitted that he was on probation and had numerous prior convictions.

The twenty-one-year-old appellant testified that he knew Sherman and that Sherman was a drug dealer. He said that he had never been arrested before this incident and that he had been to Flack's house many times. He stated that he knew of Sherman; specifically, he knew Sherman was a drug dealer and, therefore, believed Sherman carried a gun.

On October 8, 2007, the appellant had been at a junkyard with a cousin. He returned to his grandmother's house around 7:00 or 8:00 p.m. The appellant said that he did not learn of anything happening to Hamilton that day. At home, the appellant changed clothes and called Wade about playing basketball. After the call, the appellant began walking toward Wade's house. The appellant said that he had to walk past Flack's house to get to Wade's house. The appellant said that he was wearing a t-shirt, a pair of basketball shorts, and another pair of shorts. He acknowledged that he was carrying a .38 caliber revolver for protection.

As the appellant passed Flack's house, Sherman and Davis came out of Flack's house. Flack said "hey" to the appellant, and Davis asked him for a cigarette. The appellant approached and gave Davis the cigarette. Sherman walked over to the appellant and started talking to him. The appellant said that Sherman was acting "hyper." Sherman told the appellant "about him hittin[g] some bitch in the eye." Later in the conversation, Sherman revealed that the person he hit was Hamilton. The appellant told Sherman to not disrespect his cousin. Sherman continued speaking of Hamilton in derogatory terms. The appellant said that he was feeling shaky and scared because Sherman had hit his cousin, Sherman was much bigger than the appellant, and Sherman had a reputation for carrying a gun. The appellant said that Sherman took out some cocaine and snorted it. The appellant again asked

Sherman to refrain from disrespecting his cousin. Sherman responded, "I don't' really give a f[***] about s[***] 'cause I keep my heater." Sherman lifted his shirt and showed the appellant his gun which was tucked into his waistband. Sherman then told the appellant to "go get [his] whole family," and he reached for his gun. The appellant then grabbed his own gun and shot Sherman. The appellant said that after he was shot, Sherman turned and fired at the appellant, and the appellant heard another gunshot. He shot backwards toward Sherman and ran in the direction of his grandmother's house.

As he ran, the appellant threw his gun into a dumpster by the "Rec Center." He said that he did not want to keep the gun because he knew he had shot Sherman. The appellant did not know until later that Sherman was dead. He stated that he drew his gun in self-defense because Sherman drew his gun and the appellant feared Sherman would kill him.

On cross-examination, the appellant conceded that he did not dispute that Sherman's gunshot wound was inflicted at close range. The appellant also conceded that he shot toward the house at least one other time. He acknowledged that he did not turn himself into the police until two days after the shooting and after speaking with his grandmother and an attorney. The appellant said that he obtained the revolver in July 2007. He agreed that Sherman's "disrespecting" Hamilton angered him. The appellant maintained that he had fired a gun only one time prior to October 8, 2007. The appellant asserted that there were no children on the front porch of Flack's house.

The jury convicted the appellant of second degree murder and reckless endangerment. The trial court sentenced the appellant to concurrent sentences of twenty years for the second degree murder conviction and two years for the reckless endangerment conviction.

On appeal, the appellant argues that the evidence was insufficient to support his second degree murder conviction, the trial court erred in excluding evidence of the victim's prior bad acts, the trial court erred in allowing the State to introduce on cross-examination a letter written by the appellant, the trial court erred by giving the jury an instruction regarding flight, and the trial court erred in sentencing the appellant.

## II. Analysis

### A. Sufficiency of the Evidence

The appellant argues on appeal that the evidence was insufficient to support his conviction of second degree murder. Specifically, he contends that the jury should have found that he acted in self-defense.

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proved, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

To sustain the appellant's conviction for second degree murder, the State was required to prove that the appellant knowingly killed the victim. See Tenn. Code Ann. § 39-13-210(a)(1). Our supreme court has determined that second degree murder is a result of conduct offense. See State v. Ducker, 27 S.W.3d 889, 896 (Tenn. 2000). Accordingly, "[a] person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b). In the light most favorable to the State, the proof at trial revealed that the appellant fired his gun at Sherman's ribs from close range, which obviously was likely to cause Sherman's death. Moreover, there was testimony that Sherman had assaulted the appellant's cousin, Hamilton, earlier in the day. The appellant testified that when he was speaking with Sherman, Sherman referred to Hamilton in derogatory terms and that Sherman's "disrespecting" Hamilton angered him. The jury could have inferred that the shooting was in retaliation for the assault on Hamilton. Therefore, we conclude that the proof was sufficient to sustain the appellant's second degree murder conviction.

However, the appellant argues that evidence showed that he acted in self-defense. Self-defense is essentially a fact question for the jury. State v. Clifton, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994); State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). As

such, "in the context of judicial review of the jury verdict, in order to prevail, the [appellant] must show that the evidence relative to justification, such as self-defense, raises, as a matter of law, a reasonable doubt as to his conduct being criminal." Clifton, 880 S.W.2d at 743. In determining whether an appellant acted in self-defense, a jury must determine "whether the [appellant's] belief in imminent danger was reasonable, whether the force used was reasonable, and whether the [appellant] was without fault." State v. Thomas Eugene Lester, No. 03C01-9702-CR-00069, 1998 WL 334394, at *2 (Tenn. Crim. App. at Knoxville, June 25, 1998).

Tennessee Code Annotated section 39-11-611(a) provides:

> A person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds.

See also State v. Fred Edmond Dean, No. 03C01-9508-CC-00251, 1997 WL 7550, at *6 (Tenn. Crim. App. at Knoxville, Jan. 10, 1997). Furthermore, "once evidence is admitted supporting the defense, the state must prove beyond a reasonable doubt that the defendant did not act in self defense." State v. Amy Boyd, No. E1999-02218-CCA-R3-CD, 2000 WL 1376674, at *2 (Tenn. Crim. App. at Knoxville, Sept. 26, 2000).

The jury was presented with conflicting versions of events regarding Sherman's possession of a gun on the night of the shooting. The State's witnesses testified that they did not see Sherman with a gun that night. Flack admitted that Sherman usually carried a gun, but she was adamant that he did not have a gun when he was shot. She also denied removing a gun from his body, even though she admitted to removing money and cocaine. The appellant and his witnesses testified that Sherman had a gun. Witnesses also testified that Flack removed a gun from Sherman's body. The appellant testified that Sherman pulled up his shirt and flashed his gun at the appellant. When he saw Sherman reach across his body, the appellant assumed he was drawing the gun. It is well-established that determining the credibility of witnesses is within the purview of the jury. See State v. Millsaps, 30 S.W.3d 364, 368 (Tenn. Crim. App. 2000). In the instant case, the jury clearly resolved the issue of credibility in the State's favor. We may not now reconsider the jury's credibility assessment. See State v. Carruthers, 35 S.W.3d 516, 558 (Tenn. 2000). We conclude that the evidence

was sufficient to support the appellant's convictions.

## B.  Evidentiary Issues

The appellant raises two issues regarding the admissibility of evidence.  First, he complains that the trial court erred by refusing to allow the defense to present proof of the victim's pending felony drug charges, which could have helped substantiate the appellant's self-defense claim.  Second, he maintains that the trial court erred by allowing the appellant to be cross-examined regarding a prejudicial and inflammatory letter the appellant wrote while in custody, which letter was not disclosed during discovery.

Our supreme court has stated that "questions concerning the admissibility of evidence rest within the sound discretion of the trial court, and this Court will not interfere in the absence of abuse appearing on the face of the record."  Pylant v. State, 263 S.W.3d 854, 870, 871 n.26 (Tenn. 2008) (citing State v. Dotson, 254 S.W.3d 378, 392 (Tenn. 2008); State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997); State v. Van Tran, 864 S.W.2d 465, 477 (Tenn. 1993); State v. Harris, 839 S.W.2d 54, 73 (Tenn. 1992)).

### 1.  Sherman's Criminal History

The appellant argues that the trial court erred in excluding evidence of Sherman's recent criminal charges to corroborate the appellant's testimony that Sherman was carrying a gun the night of the shooting.  The appellant contends that this evidence would have helped establish that Sherman was the first aggressor.  The State argues that the trial court did not err.

Prior to trial, the State filed a motion in limine requesting that the trial court preclude any comments or references to Sherman's prior criminal history, including arrests and convictions.  The trial court heard the motions immediately prior to trial.  The State asked that any references to Sherman's prior criminal history be excluded until the issue of self-defense was raised by the proof.  The trial court ruled that the attorneys for both the State and the appellant must approach the bench before any such references were made.

Generally, "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity with the character or trait on a particular occasion."  Tenn. R. Evid. 404(a); see also Tenn. R. Evid. 404(b).  Nevertheless, if a defendant raises a claim of self-defense, then Tennessee Rule of Evidence 404(a)(2) "permits the defendant to offer proof of the victim's 'pertinent' character for violent behavior to help establish that the victim was the aggressor."  Neil P. Cohen et al. Tennessee Law of Evidence § 4.04[5][c] (LEXIS publishing, 6th ed. 2011).  However, pursuant to Tennessee Rule of

Evidence 405(a), this substantive evidence may be established only by reputation or opinion and specific acts may be inquired into only on cross-examination. Id. Evidence of the victim's character, when used solely to corroborate the defendant's claim that the victim was the first aggressor, may be admitted during the direct testimony of a witness. See State v. Ruane, 912 S.W.2d 766, 779 (Tenn. Crim. App. 1995); State v. Hill, 885 S.W.2d 357, 361 n.1 (Tenn. Crim. App. 1994); State v. Furlough, 797 S.W.2d 631, 649 (Tenn. Crim. App. 1990). Before proof of first aggression may be admitted, the following conditions must be satisfied:

> 1. Self-defense must be raised by the proof and not by the words and statements of counsel.
>
> 2. The trial judge must determine whether or not there is a factual basis underlying the allegations of tendencies of first aggression.
>
> 3. The trial judge must determine whether or not the probative value of the evidence is outweighed by the potential for unfair prejudice.

See Ruane, 912 S.W.2d at 781.

The appellant cites a specific section of the record to support his contention that the trial court ruled that defense counsel was not permitted to reference the victim's prior criminal history. However, we have examined that portion of the record, and the appellant's assertion is incorrect. The trial court made no such ruling. Instead, the trial court asked the parties to argue again after the issue of self-defense was raised by the proof. However, neither party cites to any occasion where defense counsel raised the issue again after putting on proof regarding his claim of self-defense. See Tenn. Ct. Crim. App. R. 10(b); Tenn. R. App. P. 27(a)(7). Additionally, our review of the record reveals no attempt to raise the issue again for a formal ruling. Accordingly, the trial court never held a hearing under Rule 404 of the Tennessee Rules of Evidence to determine the admissibility of Sherman's criminal history and, therefore, the trial court never made a specific ruling regarding the admissibility of the evidence. This court has no obligation to grant relief "to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 36(a). For this reason, we conclude that the appellant has waived the issue.

### 2. State's Cross-Examination About Letter

The appellant also argues that the trial court erred in allowing the State to cross-examine him regarding a letter he wrote while he was in custody. He complains that the letter was not disclosed during discovery and that the letter contained language that could potentially inflame and prejudice the jury against him. The State argues that the trial court acted within its discretion and, therefore, there was no error.

After the direct examination of the appellant and prior to the State's cross-examination, the State asked for a jury-out hearing on its intent to introduce a letter written by the appellant while he was in jail. The State argued that, through the cross-examination of the State's witnesses and the presentation of the appellant's witnesses, the defense had attempted to portray the appellant as a "choir boy" by eliciting proof that the appellant did not have a criminal record; that Sherman normally carried a gun; that the appellant was afraid of Sherman because Sherman carried a gun and Sherman had a reputation as drug dealer; and that the appellant, like everyone else in his neighborhood, carried a gun for protection. The State maintained that the logical inference from this evidence was that the appellant was a peaceful individual. The State contended that the letter established the appellant's gang membership, which counteracted the inference that the appellant was just a "kid" who was "scared." The State also maintained that the letters showed that the shooting was a retaliatory act for Sherman harming Hamilton.

The appellant argued that the letter was not given to counsel during discovery and, therefore, was not admissible. The State argued that the letter was not discoverable because the State did not seek to introduce it in its case-in-chief. The State further argued that the appellant had opened the door by raising the issue of the appellant not being "tough" and that certain portions of the letter were needed to show the appellant's character. The trial court took a recess so that the appellant's counsel could study the letter in question. After a lengthy hearing under Rule 404, the trial court ruled that this evidence put the appellant's character into issue, and the State could cross-examine the appellant with the letter. However, the entire letter was not allowed into evidence and the State was not allowed to make any references to the appellant's possible gang membership. The State cross-examined the appellant regarding specific portions of the letter, but the letter itself was never admitted as an exhibit for the jury. The letter was put into the record for appeal purposes only.

On cross-examination, the State asked the appellant if he had written a letter to his friend, Justin McDowell. The appellant acknowledged that he had. The State asked if the appellant wrote, "'I knew I was going to get locked up that night, man." The appellant said yes, acknowledged that he was referring to the shooting of Sherman, and explained that he knew he was going to jail after he had turned himself in. The State next asked about the appellant writing "'I hope these' – and I'm not going to use the term because your lawyer has objected to it – "don't give a n[*****] a life sentence. You feel me cuz?'" The appellant said

that he had meant that he knew he was going to jail and that he was not acknowledging that he had intended to kill Sherman. Finally, the State asked the appellant if he had used the expression "'all the goons from Lonsdale are really locked up now.'" The appellant answered in the affirmative. The State asked if the phrase had any particular significance. The appellant explained that he used the word "goons" because he had heard a rapper frequently using the word. When the State asked the appellant why he referred to McDowell as "'cuz,'" the appellant explained that "everybody around by neighborhood says cuz," regardless of an actual familial relationship.

On appeal, the appellant argues that the trial court erred in allowing the State to cross-examine the appellant about the letter. The appellant argues that the letter should not have been used because he was not provided the letter in discovery. However, the appellant puts forth no argument or authority to support his argument that the trial court erred in allowing the State to cross-examine the appellant because the letter was not provided during discovery. Tennessee Rule of Appellate Procedure 27(a)(7) provides that a brief shall contain "[an] argument . . . setting forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on." Tennessee Court of Criminal Appeals Rule 10(b) states that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." See also State v. Sanders, 842 S.W.2d 257, 260-61 (Tenn. Crim. App. 1992). Because the appellant has included neither argument nor authority for the failure to provide the letter in discovery, we conclude that the issue is waived.

The appellant specifically argues the following:

> The State made reference to various slang and slurs commonly used in [the appellant's] neighborhood that are considered offensive by others. In [the appellant's] letter, [he] refers to his potential jurors as 'crackers' and states that he hopes that "D's crackers don't give a n[****] a life sentence." . . . [The appellant] also discusses being out in his neighborhood as "gangsta movin we n[*****] da shit." . . . This language was highly prejudicial and served only to inflame the jury with its offensive language.

Our review of the record reveals that neither statement was used by the State on cross-examination and that the statements were contained only in the letter, which was never submitted to the jury. Therefore, neither of these statements prejudiced the jury against the appellant.

-14-

The appellant's sole citation regarding the inadmissibility of the letter was to Rule 403 of the Tennessee Rules of Evidence, which provides that even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Although not explicitly cited by the appellant, his argument appears to be based on Tennessee Rule of Evidence 404, which addresses the admissibility of character evidence. Specifically, Rule 404(a) provides:

> [E]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity with the character or trait on a particular occasion, except:
>
> (1) . . . evidence of a pertinent character trait offered by an accused or by the prosecution to rebut the same . . . .

Tenn. R. Evid. 404(a)(1). The treatise, Tennessee Law of Evidence, elaborates on this exception to the general ban on character evidence of the accused, explaining that Rule 404(a)(1) embodies a very important exception to this general bar on the admissibility of character evidence of the accused. Neil P. Cohen et al. Tennessee Law of Evidence §4.04[4][a] (LEXIS publishing, 6th ed. 2011). This exception allows admission of character evidence when the accused "opens the door" by introducing evidence to prove a "pertinent" character trait, inevitably to demonstrate his or her own good character. Id. However, the accused is only allowed to introduce evidence of a "pertinent" character trait, meaning a character trait at issue in the trial. Id. § 4.04[4][b]. For example, the accused's character for honesty would be a pertinent character trait if he or she were charged with embezzlement. Id. Once the accused has introduced evidence of his own good character, the State, in order to prevent the trier of fact from receiving a one-sided view of the accused's character, may also address the character of the accused. Id. § 4.04[4][a]. While the defendant's proof under Rule 404(a) is limited to reputation and opinion evidence only, the State may introduce evidence of specific instances of conduct when cross-examining a defense witness in response to the presentation by the accused of this reputation or opinion character evidence. Id. § 4.04[4][c].

In the instant case, the appellant put his character at issue through cross-examination of the State's witnesses, his own testimony, and the testimony of his witnesses. The letter shows that the appellant was not an innocent based upon his knowledge of the criminal justice system and his familiarity with the "goons being locked up." Also, the State asked limited questions, and the appellant was allowed to explain his statements made in the letter. For this reason, we conclude that the probative value outweighed the danger of unfair prejudice. We conclude that the trial court did not abuse its discretion in allowing the State

to cross-examine the appellant with regard to the letter in question.

## C. Flight Instruction

The appellant argues that the trial court erred in granting the State's request for a "flight instruction" as part of the jury charge. The State disagrees.

"It is well-settled in Tennessee that a defendant has a right to a correct and complete charge of the law so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." State v. Farner, 66 S.W.3d 188, 204 (Tenn. 2001). Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." State v. Davenport, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998).

In order for a trial court to charge the jury on flight as an inference of guilt, there must be sufficient evidence to support such instruction. There is sufficient evidence to support a jury charge on flight where there is proof of "'both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown.'" State v. Burns, 979 S.W.2d 279, 289-90 (Tenn. 1998) (emphasis omitted) (quoting State v. Payton, 782 S.W.2d 490, 498 (Tenn. Crim. App. 1989)); see also State v. Donald Franks, No. W2003-00003-CCA-R3-CD, 2003 WL 22351024, at *3 (Tenn. Crim. App. at Jackson, Oct. 14, 2003). The State can satisfy the subsequent hiding out, evasion, or concealment requirement by introducing evidence from which a jury might infer such action. See State v. Terrance Wilks, No. W1999-00279-CCA-R3-CD, 1999 WL 1097832, at *4 (Tenn. Crim. App. at Jackson, Nov. 22, 1999). "Any contradictory evidence that serves to rebut the state's proof merely raises a question for the jury to resolve." Id. This court has explained that:

> "The law makes no nice or refined distinction as to the manner or method of a flight; it may be open, or it may be a hurried or concealed departure, or it may be a concealment within the jurisdiction. However, it takes both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown, to constitute flight."

State v. Whittenmeir, 725 S.W.2d 686, 688 (Tenn. Crim. App. 1986) (quoting Rogers v. State, 455 S.W.2d 182, 187 (Tenn. Crim. App. 1970)). It is proper for the trial court to instruct the jury on flight when the issue has been raised by the proof. See State v. Kendricks, 947 S.W.2d 875, 885-86 (Tenn. Crim. App. 1996).

In the case herein, the trial court gave the following instruction:

> The flight of a person accused of a crime is a circumstance which, when considered with all the facts of the case, may justify an inference of guilt. Flight is the voluntary withdrawal of oneself for the purpose of evading arrest or prosecution for the crime charged. Whether the evidence presented proves beyond a reasonable doubt that the defendant fled is a question for your determination.
>
> The law makes no precise distinction as to the manner or method of flight. It may be open, or it may be a hurried or concealed departure, or it may be a concealment within the jurisdiction. However, it takes both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown, to constitute flight.
>
> If flight is proved, the fact of flight alone does not allow you to find the defendant – does not allow you to find that the defendant is guilty of the crime alleged. However, since flight by a defendant may be caused by a consciousness of guilt, you may consider the fact of flight, if flight is so proven, together with all of the other evidence when you decide the guilt or innocence of the defendant. On the other hand, an entirely innocent person may take flight and such flight may be explained by proof offered, or by the . . . facts and circumstances of the case.
>
> Whether there was flight by the defendant, the reasons for it, and the weight to be given it are questions for you to determine.

Reviewing the evidence elicited at the trial herein, we note that the evidence clearly shows that the appellant left the scene of the shooting. Specifically, witnesses testified that he ran away immediately after he shot Sherman. In addition, the evidence showed that the appellant concealed himself. Officers searched for the appellant for two days. This search included going to Sherman's grandmother's house to search for him. We acknowledge that the appellant turned himself in two days after the shooting; however, he was fully concealed and his whereabouts were unknown for the two days in question. After a review of the

-17-

evidence, we determine that there was arguably enough evidence of flight to fairly raise the issue for the jury's determination. Therefore, the trial court did not err in so instructing the jury.

## D. Sentencing

Finally, the appellant argues that the trial court erred in imposing a twenty-year sentence for his second degree murder conviction. The State disagrees.

Previously, appellate review of the length, range, or manner of service of a sentence was de novo with a presumption of correctness. See Tenn. Code Ann. § 40-35-401(d). However, our supreme court recently announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). Our supreme court has further explicitly stated that "the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing, including the questions related to probation or any other alternative sentence." State v. Christine Caudle, __ S.W.3d __, No. M2010-01172-SC-R11-CD, 2012 WL 5907374, at *5 (Tenn. at Nashville, Nov. 27, 2012). In conducting its review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, 380 S.W.3d at 697-98. The burden is on the appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be

adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; see also Bise, 380 S.W.3d at 701; State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343. "[A]ppellate courts are therefore left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence." Id. at 345-46. "[They are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346.

At the sentencing hearing, the trial court found the following enhancement factors: (3) that the offense involved more than one victim; (9) that the appellant possessed or employed a firearm during the commission of the offense; and (10) that the appellant had hesitation about committing a crime when the risk to human life was high. Tenn. Code Ann. § 40-35-114(3), (9), and (10). In mitigation, the court found that the appellant had no prior criminal record, that he had expressed remorse, and that he was employed at the time of the offense. See Tenn. Code Ann. § 40-35-113(13). The court noted that as a standard, Range I offender, the appellant was subject to a sentence between fifteen and twenty-five years for the second degree murder conviction, which was a Class A felony. See Tenn. Code Ann. §§ 39-13-210(c); 40-35-112(a)(1). The court placed heavy weight on enhancement factors (3) and (10) and decided to sentence the appellant to the midpoint in the range, which was twenty years.

On appeal, the appellant does not argue that the trial court erred in applying any of the enhancement factors, and, upon review, we can discern no error in their application. However, the appellant argues that the trial court inappropriately weighed the enhancement factors and mitigating factors at the sentencing hearing. However, the weighing of mitigating and enhancement factors is in the trial court's discretion, and this court is bound by the trial court's sentencing decisions as long as sentence is imposed in a manner consistent with the purposes and principles of the Sentencing Act. Carter, 254 S.W.3d at 345-46. Because the trial court's imposition of sentence is consistent with the purposes and principles

of the Sentencing Act, the sentence is presumptively correct, and we cannot reweigh the enhancing and mitigating factors. See Carter, 254 S.W.3d at 344-45. Therefore, this issue is without merit.

### III.  Conclusion

In sum, we conclude that there was sufficient evidence to support the appellant's second degree murder conviction, the trial court did not err in excluding evidence of the victim's prior criminal history, the trial court did not err in allowing the State to cross-examine the appellant regarding statements he wrote in a letter, that the trial court did not err in giving a flight instruction, and the trial court did not err in sentencing. Accordingly, we the judgments of the trial court are affirmed.


_____
NORMA MCGEE OGLE, JUDGE